DREW, J.
 

 [ following a joint bench trial, defendants Tiffany Monique Woods and Emmanuel Scott were convicted of second degree murder. Each was sentenced to the mandatory term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Timely motions for reconsideration of sentence were denied. Defendants appeal. We affirm.
 

 FACTS
 

 Emmanuel Scott and Tiffany Monique Woods had a common-law relationship in New Orleans. Their home contained two children of Ms. Woods, and one child of Mr. Scott; together, their union produced one child, “Little Emmanuel,” decedent herein, born June 23, 2005. As a consequence of Hurricane Katrina, they evacuated to the Shreveport area in August 2005 and lived in shelters for several weeks before moving into a home in Shreveport.
 

 On November 27, 2005, emergency personnel were dispatched to their home after Little Emmanuel was found in his crib unresponsive. The parents reported that they had each conducted CPR on the child.
 

 The law officers who arrived to investigate the incident observed the young child to be severely emaciated. An autopsy was later performed. The coroner ruled the cause of the child’s death to be malnutrition.
 

 The child lived only five months. This chronological record of the child’s weight may be instructive:
 

 • As of date of birth, June 23, 2005 — 3 pounds, 2 ounces
 

 • As of release from the hospital, August 2, 2005 — 5 pounds, 6 ounces
 
 [1]
 

 12* As of date of death, November 27, 2005 — 5 pounds, 13 ounces.
 
 [2]
 

 The child was 45 centimeters (17.7 inches) in length upon release from the hospital. At the time of his death, 107 days later, he was 56 centimeters (22 inches) in length.
 

 Corporal Patrick McConnell, a detective with the Shreveport Police Department, testified that:
 

 • he arrived at the scene on November 27, 2005, finding the house had been encircled with yellow crime scene tape;
 

 • he viewed the baby’s body in the medic unit parked at the home;
 

 • the child’s body was very thin, with mucus on his face;
 

 • the house was very clean and tidy;
 

 • the refrigerator was well stocked with food, organic milk, condiments, and beer;
 

 • jars of baby food were on top of the refrigerator;
 

 • in the bedroom was a full-sized bed, a play pen, and an infant bed;
 

 • he found two bottles of milk in the infant bed and one empty bottle inside the playpen;
 

 • he observed a heart monitor found in a closet;
 

 • he found that Woods’ story that she performed CPR on the infant to be inconsistent with the mucus present on the child’s mouth, in that the mucus would have been wiped away before or during CPR; and
 

 • he conducted recorded interviews with the defendants, without benefit of
 
 Mi
 
 
 *1282
 

 randa
 
 warnings, as he was not then conducting a homicide investigation.
 

 Beverly Hunter, a now-retired social services worker, testified that:
 

 • on the day of the incident, she was the on-call supervisor for an emergency hotline relative to the protection of children;
 

 |s* she arrived after 1:00 p.m. and conducted interviews with family members (including both defendants);
 

 • the other children appeared unkempt, with one child being very dirty;
 

 • she was in the home about 3½ hours, and never observed anyone change the child’s diaper, so she changed it herself, noticing spots on her bottom, dried mucus on her face, and a very lethargic demeanor;
 

 • Woods also had “a very flat affect” and when talking about grieving, Woods stated, “I’m not grieving” and “When I found it, it was stiff. It was going to die. I didn’t kill it, and it was going to die, anyway”;
 
 [3]
 

 • after consulting with law enforcement on the scene, Ms. Hunter became suspicious of the death and the overall care of the children, so the other three children were taken into custody;
 

 • the children were ready to leave, something highly unusual; and
 

 • many parents desire privacy under such circumstances and the workers were trained to recognize such possible reactions.
 

 Dr. Frank Peretti, an expert in forensic pathology, testified that:
 

 • he took photographs of the child’s body, performed an autopsy, and reported his findings;
 

 • his first impression was that the child was severely malnourished;
 

 • trauma as a cause of death was ruled out;
 

 • he found no evidence of a natural disease process;
 

 • the cause of death was malnutrition, which had gone on for months;
 

 • the infant had a high blood urea nitrogen (BUN) level which indicated that the victim was in kidney failure due to malnutrition;
 

 • the body contained no fat, indicating the use of fat as nutrition;
 

 • there was no evidence of pyloric steno-sis, which, if present, could have made it difficult for the child to feed;
 

 • there was no evidence of an anatomical defect preventing food intake;
 

 • all babies, including premature ones, are born with fat on their bodies;
 

 14* the victim’s intestines were not developmentally abnormal;
 

 • because the child had some medical history, he ruled the cause of death as malnutrition (the child not getting enough food) as opposed to starvation, which involves deliberate withholding of food; however
 

 • the child’s body contained no food, no fat, and no muscle;
 

 • the fact that a child was starved would not prevent a disorder from being apparent during the autopsy; and
 

 • the victim did not have a metabolic disorder.
 

 Dr. Gerald Whitton, an expert in pediatrics and neonatology, testified that:
 

 • his daily practice consisted of caring for babies, the majority of them premature, in the neonatal intensive care unit (NICU);
 

 • he reviewed the victim’s medical records from Tulane Medical Center
 
 *1283
 
 (“TMC”) and the autopsy report prepared by Dr. Peretti;
 

 • the victim was delivered at 31¾ weeks of gestation
 
 [4]
 
 by emergency Caesarean section as a result of a placental abruption;
 
 [5]
 

 • during the pregnancy, the mother had limited prenatal care;
 

 • the mother used marijuana and drank beer during the pregnancy;
 

 • the emergency delivery was unproblematic, though the child was born weighing only 3 pounds, 2 ounces;
 

 • the victim had minor problems normally associated with an intensive care stay, such as high blood sugar and electrolyte abnormalities, as well as a positive screen for medium chain aeyl-CoA dehydrogenase deficiency (“MCAD”), though a false positive occasionally occurs with a premature child;
 

 • the false positive was confirmed by the geneticists at TMC;
 

 • the child was initially fed through a tube and then he was able to adapt to nipple feedings, thereby gaining adequate weight until reaching the 10th percentile growth curve during his hospitalization;
 

 R* based on his weight at death, his growth curve was essentially flat from the time of his discharge to the time of his death;
 

 • at discharge from TMC, the child weighed 5 pounds, 6 ounces;
 

 • at his death, the child had gained only seven ounces, even though at the time of discharge from TMC, the child had been gaining weight at the rate of approximately one ounce per day;
 

 • viewing the pre-autopsy photos of the deceased child, he did not believe that the child would have been discharged from the hospital had he presented with a similar appearance or condition;
 

 • a baby fed organic cows’ milk will experience many complications, though the child will continue to grow to some extent;
 

 • cause of death was malnourishment, and it would have taken an extended time for the baby’s condition to deteriorate to this extent;
 

 • lack of nutrition would have brought about noticeable changes in the child, such as irritability, decreased activity, and the onset of lethargy;
 

 • medical intervention could have averted the child’s death;
 

 • emergency medical care is never refused based on inability to pay;
 

 • he had not treated the victim, and his opinions were based on his general knowledge and training;
 

 • he was not familiar with the specific procedures employed by TMC;
 

 • the records indicated that Woods had received CPR instruction and “generally” with CPR there would be other education provided, but he was not aware of the specific training, education, or instruction either parent received;
 

 • he believed the MCAD test was probably a false positive, potentially caused by the child’s prematurity;
 

 • later confirmatory tests detected no abnormalities;
 

 • additional testing was ordered at TMC, but the patient did not show;
 

 • the child’s growth, while hospitalized, was within the lower normal range, as
 
 *1284
 
 the victim was within the 10th percentile;
 
 [6]
 

 In* it is the legal obligation of a physician to report any suspected abuse;
 

 • there were various reasons why a child would not feed well, and generally, if presented with the situation, a medical evaluation would be performed to determine the cause of the problem;
 

 • possible causes could stem from metabolic issues, infection (viral or bacterial), constipation, or suck and swallow issues;
 

 • both the physical therapist and occupational therapist who treated the victim during his hospitalization found that he was not experiencing great difficulty with “suck and swallow” techniques, as the baby was still receiving proper nutrition and gaining weight;
 

 • this child was the “worst-off baby” he had ever seen; and
 

 • nothing in the medical records indicate that the victim could not reach the goals set by the nutritionist or was predisposed to malnutrition.
 

 Defendant Scott, the victim’s father, testified that:
 

 • his son was quite small at birth;
 

 • he worked while Woods took care of the children;
 

 • there were three children in the home, besides Little Emmanuel;
 

 • after the hospital discharge, the baby would spit up milk, though Scott did not think that was a problem, as her daughter had done the same thing;
 

 • the family evacuated to Shreveport as a result of Hurricane Katrina, and they lived in shelters upon their arrival;
 

 • medical personnel were present at the shelters and one couple volunteered to use their insurance to take the child to the doctor;
 

 • he believed what he and Woods were doing was the best they could;
 

 • the family found a home in Shreveport and he worked at McDonald’s, while Woods stayed at home, caring for the two youngest children, with the help of the oldest child, an eight-year-old;
 

 • two weeks before the child died, the family ran out of WIC vouchers;
 

 • they then tried organic cows’ milk to get the child to feed better;
 

 • the baby appeared to tolerate the milk with no problem;
 

 17* the child appeared to grow longer, and because of the baby’s build, he did not see there was a problem;
 

 • he himself had been a preterm baby and he thought all was normal;
 

 • the doctors never told them anything was wrong with the child;
 

 • he did not mean to starve his child;
 

 • he never told Woods not to feed him;
 

 • the night before the victim died, he worked until around 1:00 a.m;
 

 • he watched TV briefly before going to the bedroom that he shared with Woods and the two younger children;
 

 • when he awoke the next morning, he went out to smoke a cigarette;
 

 • he saw the victim but did not touch or check on him at that time;
 

 • he later noticed something wrong with the baby’s mouth;
 

 • he grabbed the child and started CPR while Woods called 9-1-1;
 

 • at some point, they switched, with Woods performing CPR and Scott talking to the 9-1-1 operator;
 

 
 *1285
 
 • his lack of emotion at the scene was because he believed that the baby would revive because the victim gasped for air during CPR;
 

 • he was not told on the scene that the child was dead;
 

 • he loved his children and did not intend to neglect the baby;
 

 • he had a ninth grade education and had not completed a GED class;
 

 • the victim received inoculations from Shots for Tots in Shreveport;
 

 • the family had enough income to purchase food but the decision to switch to watered down organic cows’ milk was in part an attempt to keep the victim from spitting up so frequently;
 

 • the baby never deteriorated after the switch to diluted milk; and
 

 • prior to the victim’s death, Scott never saw anything to alarm him nor did he believe there was any reason to contact a doctor.
 

 Dr. Shalinee Singh, an expert in the field of pediatrics, testified that:
 

 lx* she reviewed the child’s medical records including discharge summaries;
 

 • the medical records lacked social service notes and lab results;
 

 • she reviewed the letter from the geneticist to Dr. Whitton regarding retesting the victim but the results of the test were not in the record;
 

 • she reviewed the dietician’s notes which showed that the dietician believed the victim was not quite meeting the caloric requirements necessary for him to thrive once he began feeding orally;
 

 • the dietician recommended that the formula intake be increased;
 

 • even at the hospital, the child was receiving only enough nutrition to meet the lower end of his energy needs, but not enough to grow;
 

 • the treating physician recommended that the child’s intake be increased, but the nurses were unable to meet the child’s caloric needs, even with around-the-clock feedings;
 

 • she was surprised that the baby was discharged, considering that the nurses had not been able to meet the child’s feeding goals;
 

 • if the nurses couldn’t meet the feeding goals in the hospital, then a mother would certainly be unable to meet the goals at home;
 

 • the physical therapist had been unable to evaluate the victim’s ability to suck because every time she went to see the victim, he was asleep;
 

 • one week prior to discharge, the victim was termed a poor feeder;
 

 • one week prior to discharge, the mother had not had the opportunity to practice and show the nurses that she could feed the victim;
 

 • she would not have released the child had she been his treating physician;
 

 • the medical records did not contain any notes indicating that Scott received any educational counseling regarding proper infant care;
 

 • a pediatrician should have followed a child after release from neonatal care;
 

 • whether the victim had a metabolic defect had neither been discounted nor established by the information she reviewed;
 

 • a child with a metabolic defect can look like the pre-autopsy photos;
 

 19* she did not find the records where disease had been ruled out;
 

 • the nutritionist treating the baby noted that he was at low risk for nutrition and was gaining weight, and that the occupational therapist noted that the
 
 *1286
 
 child was feeding well prior to his discharge;
 

 • she was unaware that Woods had other children older than the victim, and this fact would have been considered in determining when the victim could be safely discharged from the hospital, as a mother with children would have needed less instruction than a first-time mother;
 

 • a child switched to diluted cows’ milk would develop “dramatic and observable health problems” and there would have been “gross evidence” of the problems the child was experiencing;
 

 • she was familiar with the WIC program that provided nutritional aid to mothers, infants and children;
 

 • WIC requires a pediatrician’s documentation of weight and sometimes a prescription for the formula;
 

 • if parents give an infant cows’ milk, instead of formula, the child would have quickly suffered as a result of the diet; but
 

 • she has found that an adverse change in a child’s diet was usually due to uneducated parents, as opposed to a desire to harm a child.
 

 Defendant Woods testified on her own behalf, recalling that:
 

 • she started caring for the baby right before the hospital discharge;
 

 • she was shown a video on CPR the night before leaving the hospital;
 

 • this was the full and total extent of the training she received;
 

 • she was instructed to give the baby medicine every day, to utilize a heart monitor, and to feed the child every three to four hours;
 

 • she had immediate problems working with the heart monitor;
 

 • she asked for help with the machine, to no avail;
 

 • she was unsupervised when feeding Emmanuel prior to his release from the hospital and had given him only one bottle at the hospital;
 

 • the victim would not take much of the bottles he was offered;
 

 • she fed him every four hours but the child slept through the night;
 

 |10* consumption at each feeding varied, usually one or two ounces;
 

 • the baby threw up, sometimes as much as he actually consumed;
 

 • the feeding problems were to be expected with a premature child;
 

 • around the end of October, the family did not have any more WIC vouchers and the decision was made to switch to cows’ milk;
 

 • the victim took more and threw up less when consuming the milk;
 

 • she noticed no weight change upon the switch to cows’ milk;
 

 • the baby’s weight had not changed since the hospital discharge;
 

 • she noticed no health problems with the baby, other than throwing up after feedings and a slight runny nose;
 

 • her older son assisted with feeding the victim when needed;
 

 • Scott wasn’t very involved in feeding the baby because he was always at work, but when he had an opportunity, he would feed the child;
 

 • Scott suggested switching the child to cows’ milk, and she complied;
 

 • she did not drive and was unfamiliar with the Shreveport area and this prevented her from taking the victim to the doctor;
 

 • while living in a shelter, she spotted a “Shots For Tots” truck and had Scott stop so the children could receive inoculations; and
 

 
 *1287
 
 • while they were living in the shelters, all her children saw medical personnel, none of whom ever expressed any other concerns or told Woods that the victim needed to be taken to the hospital.
 

 DISCUSSION
 

 Sufficiency
 

 Woods argues that the state failed to present sufficient evidence to convict her of second degree murder; specifically, the defendant contends that the state failed to rule out that the victim died from MCAD. She also argues that the state failed to prove beyond a reasonable doubt that her care of the child was a gross deviation below the accepted standard of care.
 

 InScott argues that the state failed to prove either that he intentionally harmed the child, or that his conduct with respect to the child was criminally negligent. Further, the state failed to exclude every reasonable hypothesis of innocence, specifically that the child suffered from a physical disorder that prevented him from gaining weight.
 

 Our law on sufficiency review is well settled.
 
 [7]
 

 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24.
 

 In pertinent part, second degree murder is the killing of a human being when the offender is engaged in the perpetration of cruelty to 112juveniles, even though he has no specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).
 

 Cruelty to a juvenile, as it relates to this matter, is defined as the intentional or criminally negligent mistreatment or neglect by anyone 17 years of age or older
 
 *1288
 
 of any child under the age of 17, whereby unjustifiable pain or suffering is caused to the child. La. R.S. 14:93. The term “intentional” within the meaning of this statute requires general criminal intent to cause a child unjustifiable pain and suffering.
 
 State v. Porter,
 
 99-1722 (La.App. 3d Cir.5/3/00), 761 So.2d 115. Mistreatment as used in this statute means “abuse.”
 
 Id.
 

 Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such a disregard of the interest of the others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. Unlike general or specific criminal intent, criminal negligence is essentially negative. Rather than requiring the accused to intend some consequence of his actions, criminal negligence is found from the accused’s gross disregard for the consequences of his actions. La. R.S. 14:11;
 
 State v. Martin,
 
 539 So.2d 1235 (La.1989).
 

 The state presented testimony showing that:
 

 • the child failed to gain a significant amount of weight in the 3y¿ months between his release from the hospital and his death;
 

 • defendants failed to timely seek medical treatment for the victim who was apparently in dire straits at the time of his death;
 

 • the baby would have had an obvious bad reaction to his changed diet;
 

 |13* defendants indicated they did not observe any of these signs; and
 

 • defendants were criminally negligent in failing to so notice.
 

 The trial court orally gave detailed, cogent, and succinct reasons for finding both of the defendants guilty as charged. The reasoning reflects the mindset of a fair, impartial, and hard-working jurist. We appreciate the efforts of the trial court in this depressing case.
 

 The bottom line is that the state proved that these defendants criminally mistreated this child, resulting in his death due to malnutrition. The photos of the baby are grotesque, horrifying, and inexcusable.
 

 Excessiveness
 

 Defendants argue that the punishment here does not fit the crime, in that there was no showing of anyone’s intent to kill the baby, or to inflict great bodily harm. They argue that life sentences under these facts are clearly excessive.
 

 The state replies that neither defendant clearly and convincingly showed, under these facts, that unusual circumstances exist, requiring for either sentence a downward departure from the mandatory sentence fixed by the statute and imposed by the trial court. The argument that the other children are being deprived of their parents has no merit, considering the treatment afforded their baby.
 

 Our law on the appellate review of mandatory sentences is well settled.
 
 [8]
 

 
 *1289
 
 114This was not the first child to be in this household. The defendants were already in the process of rearing three children when Little Emmanuel was born. There is no excuse for what these two people allowed to happen to the infant.
 

 The gravity of the offense and the culpability of the defendants warrant no downward departure from their legislatively mandated sentences.
 

 DECREE
 

 The convictions and sentences for these defendants are AFFIRMED.
 

 [1]
 

 . A gain of 36 ounces in the 40 days of hospitalization.
 

 [2]
 

 . A gain of 7 ounces in the 107 days between release from the hospital and death.
 

 [3]
 

 . Use of the impersonal pronoun speaks volumes as to the lack of bonding.
 

 [4]
 

 . "Full-term” is considered 40 weeks.
 

 [5]
 

 . A condition where the placenta tears away from the uterus.
 

 [6]
 

 . Average growth would be from the third to the 97th percentile.
 

 [7]
 

 . The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App. 2d Cir. 1/9/08), 974 So.2d 181,
 
 writ denied,
 
 2008-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App. 2d Cir.1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App. 2d Cir.2/25/09), 3 So.3d 685;
 
 State v. Hill,
 
 42,-025 (La.App. 2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 
 See
 
 also,
 
 State v. Bowie,
 
 43,374 (La.App. 2d Cir.9/24/08), 997 So.2d 36 (same deference applies to bench trial).
 

 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App. 2d Cir. 1/14/09), 2 So.3d 582;
 
 State v. Parker,
 
 42,311 (La.App. 2d Cir.8/15/07), 963 So.2d 497.
 

 [8]
 

 . Where there is a mandatory sentence, there is no need for the trial court to justify, under Article 894.1, a sentence it is legally required to impose.
 
 State v. Burd,
 
 40,480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35;
 
 State v. Koon,
 
 31,177 (La.App. 2d Cir.2/24/99), 730 So.2d 503.
 

 The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected.
 
 State v. Parker,
 
 416
 
 *1289
 
 So.2d 545 (La.1982);
 
 State v. Brooks,
 
 350 So.2d 1174 (La.1977);
 
 State v. Roberson,
 
 40,-809 (La.App. 2d Cir.4/19/06), 929 So.2d 789.
 

 In
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993), and
 
 State v. Johnson,
 
 1997-1906 (La.3/4/98), 709 So.2d 672, the supreme court addressed the issue of mandatory sentences in the context of the habitual offender law. The court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of (he legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. This rale has been extended to mandatory sentences beyond habitual offender cases.
 
 See State v. Fobbs,
 
 1999-1024 (La.9/24/99), 744 So.2d 1274;
 
 State v. Chandler,
 
 41,063 (La.App. 2d Cir.9/8/06), 939 So.2d 574,
 
 writ denied,
 
 2006-2554 (La.5/11/07), 955 So.2d 1277. However, the “rare circumstances” described by
 
 Johnson
 
 in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder.
 
 State v. Chandler, supra.
 
 In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the "tailoring” of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offense are so great.
 
 Id.