CARAWAY, J.
hA jury unanimously found Grady Thornton (“Thornton”) guilty of the second degree murder of his three-month-old son, “TJ,” in violation of La. R.S. 14:30.1. Thereafter, the defendant moved for post-verdict modification relief, arguing that the evidence did not sufficiently prove second degree murder. After the trial court denied his motion, Thornton received the mandatory sentence of life imprisonment without benefit of probation, parole, or suspension. The defendant appeals his conviction. For the following reasons, we affirm.

Facts

On June 24, 2008, the child’s father, Thornton, was the sole care giver of TJ from 8:30 p.m. until 6:20 a.m. Ursula Brantley (“Ursula”), Thornton’s girlfriend and TJ’s mother, was partying with her friend, Ambrielle Dawson (“Ambrielle”), and two men. As the night progressed, *1132 Thornton became increasingly angry that Ursula had gone out and not yet returned home. While Thornton was writing rap lyrics about Ursula, TJ woke up and “was just crying, crying, crying.” Thornton then called Dianne Dawson (“Dawson”), Ambrielle’s mother. During Thornton’s final call to attempt to locate Ursula at 5:36 а.m., Dawson heard TJ screaming, “a blood-curdling scream,” in the background. Based upon the phone records and testimony regarding when Ursula returned home, TJ’s fatal injuries were inflicted between 5:36 a.m. and 6:20 a.m. Thornton eventually admitted to police that he hit, shook, and squeezed TJ in an attempt to hurt Ursula.
| ^Shortly after Ursula returned home, Thornton discovered that TJ was not breathing. After attempting CPR, Ursula and Thornton drove TJ to the hospital. Despite the hospital’s best attempts, TJ died at 3:55 p.m. on June 25, 2008. Subsequently, Thornton was arrested.
On August 7, 2008, Thornton, age 18, was indicted by a grand jury and charged with committing the second degree murder of his three-month-old son. On February б, 2012, the indictment was amended, charging Thornton with second degree murder as defined by R.S. 14:30.1 in that he committed the homicide of TJ while:
(1) having the specific intent to kill or inflict great bodily harm, or
(2) while he was engaged in the perpetration or attempted perpetration of cruelty to a juvenile or second degree cruelty to a juvenile, even though he has no intent to kill or inflict great bodily harm.
The trial began on February 7, 2012, with the testimony of Ursula. At the time of TJ’s death, Ursula testified that she and Thornton had been living together for a year. She stated that it was her intention to make Thornton mad by staying out all night, a feat she admitted she accomplished.
When she arrived home around 6:20 a.m., Ursula testified that Thornton was walking around outside, and he appeared to be very angry. Shortly thereafter, Thornton informed her that something was wrong with TJ. Ursula testified that they both attempted CPR before driving to the hospital. On the way to the hospital, Thornton told her that “had you been home last night none of this would have happened.”
| ¡¡Sheila Taylor (“Taylor”), Ursula’s stepmother and a GI Technician at Willis-Knighton Pierremont, testified next. Taylor owns the house where Ursula, TJ and Thornton were living and was in her bedroom in the back of the house when TJ was fatally injured. While home, she testified that she did not hear anything nor was it common for her to hear anything from her bedroom. At the hospital, Taylor heard Thornton tell Ursula that “if she would have been at home this would have never happened.”
Dianne Dawson (“Dawson”) testified that Thornton called her in an attempt to locate Ursula. The phone records indicate that Thornton called her at 3:23 a.m. and 5:36 a.m. According to Dawson, Thornton did sound angry and upset during the last call. Thornton told her that Ursula was supposed to be home, because he had something to do. Dawson also testified that she heard TJ screaming in the background during the last phone call.
Officer Ronald Debello testified that he was dispatched to Willis-Knighton Pierre-mont to investigate allegations of child abuse. After speaking with child protective service workers and Willis-Knighton’s social worker, he realized the seriousness of the allegations and notified the Violent Crimes Division.
*1133 Shreveport Police Detectives Rod Johnson and Rod Demery from the Violent Crimes Unit were the investigators assigned to TJ’s case. Both officers were present for and conducted three interviews with the defendant. After a free and voluntary hearing, the trial court admitted all three interviews. The recordings of the interviews were played for the jury.
|4In the first interview, Thornton denied hitting TJ. He stated that after he fed and changed his son, TJ rolled off of the bed. After picking him up, Thornton stated that TJ looked fíne so he burped him and put him in his bassinet. After the officers stated that TJ’s injuries to his head were not indicative of falling off of a bed, Thornton stated that TJ hit his head on the bedside table when he fell.
During the second interview, Thornton admitted that he hit TJ in the head. Thornton stated that he lost his temper because he was angry that Ursula was not home, worried that she was cheating on him, and frustrated that TJ would not stop crying. Thornton admitted that he hit TJ in an attempt to hurt Ursula. After hitting TJ, Thornton stated that TJ stopped crying and fell asleep.
By the third interview, Thornton had been charged with TJ’s murder. The officers informed him that the autopsy results were inconsistent with his prior explanations regarding how TJ received his injuries. Initially, the defendant said that he hit TJ in the back of his head with the heel of his palm. Later, he admitted that he held TJ’s head like a basketball and squeezed. Thornton stated that he did not want TJ to die.
Dr. James Traylor conducted the autopsy in this case and was accepted by the court as an expert in forensic pathology. Dr. Traylor’s autopsy report classified the death as a homicide and determined that TJ’s cause of death was blunt force injury due to shaken impact syndrome, formerly known as shaken baby syndrome. The toxicology report showed no chemicals or drugs in TJ’s system that would have caused his death. He [.^testified that TJ suffered a radiating skull fracture, a laceration in his liver, a severed adrenal gland, and six broken ribs.
Dr. Traylor testified that the nearly four-inch fracture of TJ’s skull was a fatal injury. TJ’s fractured skull caused a large hemorrhage and swelling in the brain. The doctor also found four distinct bruises along each side of TJ’s back. Dr. Traylor suggested that the contusions on the back were made by lifting the child underneath the arms so that the thumbs were in front, resting around the bottom of the rib cage. At the bottom right side of the rib cage, TJ’s liver had lacerations or tears and the adjacent adrenal gland was completely torn in half. Additionally, six of TJ’s ribs-three on each side-were fractured. He testified that these injuries were consistent with grabbing and squeezing a child really hard, while driving the thumb into that area.
The doctor testified that squeezing the child’s head in the way Thornton described would not have created enough energy to cause the four-inch skull fracture. According to Dr. Traylor, the fractured skull was more likely caused by rapid compression, either from (1) pressure applied between two hands or (2) pressure applied to one side of the child’s head while it rested on a firm surface, as would occur if TJ was struck with the heel of a hand in a rapid, downward motion. Dr. Traylor confirmed that none of TJ’s injuries were accidental.
Thornton chose not to testify at the trial or call any witnesses. After closing arguments, the jury received instructions on second degree murder, as well as the responsive verdicts of manslaughter and *1134 negligent homicide. [fiOn February 8, 2012, a jury unanimously found the defendant guilty as charged of second degree murder. The defense filed a motion for post-verdict modification of the judgment, arguing that the state failed to prove that he was guilty, beyond a reasonable doubt, of second degree murder. On February 13, 2012, the trial court denied the defendant’s motion and found that the evidence excluded every reasonable hypothesis of innocence. After Thornton waived sentencing delays, the mandatory sentence of life imprisonment, without benefit of probation, parole, or suspension was imposed by the trial court.

Discussion

On appeal, Thornton does not argue that he is innocent. Instead, he argues that the evidence was insufficient to support a second degree murder conviction given the mitigating factors. Thornton argues that his anger at Ursula for staying out all night, suspicion that Ursula was cheating on him, and TJ’s incessant crying led him to experience a sudden heat of passion when he inflicted TJ’s injuries. A manslaughter conviction, therefore, is warranted.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L,Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d 7 Cir.1/9/08), 974 So.2d 181, unit denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La. App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of a fact, for example, a witness’ testimony that he saw or heard something.. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id. The trier of fact is charged with weighing the credibility of both direct and indirect evidence and on review, the same standard as in Jackson v. Virginia is applied, giving great deference to the fact finder’s conclusions. Id. The facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential |selement of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, unit denied, 09-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497, unit denied, 07-2053 (La.3/7/08), 977 So.2d 896.
*1135 Second degree murder is defined by La. R.S. 14:30.1 as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great' bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles [or] second degree cruelty to juveniles ... even though he has no intent to kill or to inflict great bodily harm.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant’s actions. State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, unit denied, 07-0530 (La.12/7/07), 969 So.2d 619. Specific intent to kill or inflict great bodily harm, as required to convict for second degree murder, may be inferred from the extent and severity of the victim’s injuries. State v. Patterson, 10-415 (La.App.5th Cir.1/11/11), 63 So.3d 140, writ denied, 11-0338 (La.6/17/11), 63 So.3d 1037; State v. Durand, 07-4 (La.App.5th Cir.6/26/07), 963 So.2d 1028, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Cruelty to juveniles is defined by La. R.S. 14:93(A)(1) as the intentional or criminally negligent mistreatment by neglect of anyone 17 years of age or older of any child under the age of 17 whereby unjustifiable Lpain or suffering is caused to said child. According to La. R.S. 14:93.2.3(A)(1), second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of 17 to any child under the age of 17 which causes serious bodily injury or neurological impairment to that child. Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La. R.S. 14:12.
In order to support a second degree murder conviction, the state needed to prove beyond a reasonable doubt that Thornton (1) intentionally or negligently caused (2) serious bodily harm/neurological impairment or unjustifiable pain/suffering to TJ which (3) resulted in his death. The state introduced sufficient evidence to support these elements. First of all, Thornton told Detectives Johnson and Demery that he hurt TJ in order to get back at Ursula. Additionally, Dr. Traylor testified that TJ suffered a lacerated liver, six broken ribs, and a four-inch fractured skull. Not only are these violent and severe injuries, but Dr. Traylor testified that they were intentionally inflicted. TJ died as a result of his skull fracture which Thornton inflicted. Therefore, the evidence and testimony presented to the jury sufficiently supported Thornton’s conviction.
The jury unanimously found Thornton guilty of the second degree murder of his three-month-old son, despite being given the responsive verdict of manslaughter. While the evidence was sufficient to support |insecond degree murder, it is necessary to review any mitigating factors that might warrant a lesser degree of culpability-
The offense of manslaughter is defined as a homicide that would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation suffi *1136 cient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1); State v. Miller, 36,003 (La. App.2d Cir.7/25/02), 824 So.2d 1208, writ denied, 02-2480 (La.6/27/03), 847 So.2d 1253. Sudden passion and heat of blood are mitigatory factors in the nature of a defense which exhibits a degree of culpability less than present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 (La.1986); State v. Williams, 44,977 (La.App.2d. Cir.1/27/10), 32 So.3d 902, writ denied, 10-0368 (La.9/24/10), 45 So.3d 1071.
The defendant bears the burden to prove, by a preponderance of the evidence, that he acted in sudden passion or heat of blood in order for manslaughter to be appropriate. State v. Logan, 45,136 (La. App.2d Cir.4/14/10), 34 So.3d 528, writ denied, 10-1099 (La.11/5/10), 50 So.3d 812; State v. Lang, 42,125 (La.App.2d Cir.5/30/07), 960 So.2d 318, writ denied, 07-1469 (La.1/11/08), 972 So.2d 1161; State v. Hendricks, 38,945 (La.App.2d Cir.9/22/04), 882 So.2d 1212, writ denied, 04-2833 (La.3/18/05), 896 So.2d 1000.
Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. State v. Horn, 45,706 (La.App.2d Cir.11/3/10), 55 So.3d 100, writ denied, [n 10-2721 (La.5/6/11), 62 So.3d 124. The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, writ denied, 00-0989 (La.3/23/01), 787 So.2d 1008: State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797.
In his interviews to the police, Thornton stated that he injured TJ in order to hurt Ursula. Thornton stated that he was angry with Ursula for several reasons. First of all, she did not inform him that she was going to stay out all night. Secondly, Thornton did not approve of Ursula hanging out with Ambrielle. Lastly, Thornton suspected that Ursula was cheating on him. Nevertheless, although Ursula said she would be right back, Thornton told the police that this was not the first time that Ursula failed to return home as expected. Thornton’s own admission indicates that he had previously been left alone with TJ all night without incident, and TJ’s autopsy report failed to find evidence of prior injuries.
While Thornton claims that he did not intend for TJ to die, he used excessive force on his three-month-old son without regard for his life. Dr. Traylor stated that TJ’s fractured skull could have resulted only by squeezing TJ’s head with both hands or by applying rapid pressure against a firm structure. Not only did Thornton shake and squeeze TJ, but he did both of these so hard that he fractured six ribs, lacerated his liver, and left | ^internal bruises where his fingers had been. Dr. Traylor testified and Thornton admitted that TJ’s injuries were not accidentally inflicted.
Moreover, regardless of Thornton’s argument regarding his specific intent to kill, the evidence establishes his criminal negligence for the cruelty to the juvenile. There was such a disregard for the child that Thornton’s conduct amounted to a gross deviation below the standard of care expected from a reasonably careful man under the circumstances.
Regarding the defense’s argument for manslaughter, the measure of the “provocation sufficient to deprive an aver *1137 age person of his self-control” cannot be met by reference to the crying and discomfort of an innocent victim only three months old. The average person understands that no anger, much less anger accompanied by force and harm, is a reasonable response to an infant. With provocation totally irrelevant as an adult response in such instance, Thornton’s asserted provocation by Ursula can likewise not be transferred so as to make in any manner his violence against the child less culpable. There is no reasonable correlation providing a degree of justification between TJ’s crying, the defendant’s anger over Ursula’s petty and vengeful acts, and the brutality that Thornton showed his own son.
Thornton failed to prove, by a preponderance of the evidence, that circumstances existed such that he was so provoked by sudden passion or heat of blood that he was deprived of an average person’s self-control and cool reflection. State v. Logan, supra. Thus, the evidence was sufficient to support a conviction for second degree murder. The defendant failed to | improve that he acted in sudden passion or heat of blood sufficient to reduce his culpability and render the homicide a manslaughter. State v. Allen, supra. As a result, the jury’s verdict was correct and the conviction is affirmed.

Decree

For the above reasons, the defendant’s conviction is affirmed. The defendant failed to prove that there were mitigating factors that he acted upon strong provocation in order to warrant a manslaughter conviction. As a result, the jury correctly rejected the manslaughter responsive verdict and found the defendant guilty of second degree murder.
AFFIRMED.
SEXTON, J. Pro Tern., concurs with reasons.