GARRETT, J.
*1127 The defendant, Gerderrick Davis, was convicted of second degree murder of his girlfriend's 17-month-old son, Anthony Scott, in violation of La. R.S. 14:30.1.[1] Following the denial of his motion for post verdict judgment of acquittal, the court imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Davis appeals, claiming the evidence shows that he was guilty only of manslaughter. For the following reasons, we affirm the conviction and sentence.
FACTS
Davis lived in an apartment with his girlfriend, Brittany Scott, and her 17-month-old son, Anthony. Davis frequently cared for Anthony while Brittany worked at a fast food restaurant. Davis was not employed. On the evening of November 26, 2013, Anthony was fine when Brittany left for work. When she returned home at 1:00 a.m. on November 27, Davis was holding Anthony. It is not clear whether the child was conscious. Brittany called 911 and the emergency responders came to the apartment. Anthony was taken to LSU hospital and was pronounced dead. An autopsy revealed that Anthony died of a lacerated liver caused by blunt force trauma which resulted in massive internal bleeding. Numerous other bruises and injuries were noted in the autopsy; all injuries were recent. In interviews with the police, Davis initially denied causing any injuries to the child. Following the autopsy results, he eventually admitted that he struck Anthony twice in the stomach. Davis was arrested and, in recorded telephone conversations to Brittany from jail, Davis again admitted that he struck Anthony.
Davis was originally indicted for first degree murder. The charge was later amended to second degree murder. At his jury trial, the testimony and evidence established the chain of events leading to Anthony's tragic death. Lisa Scott, the mother of Brittany and Kentrell Scott, and the grandmother of Anthony, testified that she had taken care of Anthony for two days.[2] She said Anthony was a good baby and he never cried. When Lisa dropped Anthony and Kentrell off at Brittany's apartment, Anthony did not have any bruises or marks.
Kentrell, who was 14 at the time of trial, testified that he was staying with Brittany when Anthony died. He played dominoes with Davis and Anthony would grab a domino from the table and run, or he would throw it at Kentrell and laugh. Kentrell also tried to teach Anthony to catch a soft football. Kentrell did not hear the baby crying that day. Brittany went to work and Anthony went to sleep around 10:00 p.m. Kentrell then played dominoes with Davis and watched television. Kentrell went to sleep around 11:00 p.m. and awoke to Brittany screaming.
Brittany testified that Anthony was born June 26, 2012. At the time of the child's death, she had been seeing Davis for four months and had been living with him for two months. Brittany stated that her mother kept Anthony for a couple of days prior to this incident and he was fine when she returned him.
*1128 Anthony had asthma and used a nebulizer for breathing treatments. He had an asthma spell about two weeks before his death, but was not having any symptoms immediately before his death. Brittany said that Anthony ran into a wall while playing with Kentrell, but when she bathed Anthony that evening before she went to work, she did not see any marks or bruises.
Brittany rode to work with a friend and, while she was at work, Davis called to ask when she would be home. Brittany got off work at 1:00 a.m. on November 27. When she arrived home, the door to the apartment was locked, which was unusual. She said it took Davis some time to unlock the door. Davis was pacing the floor holding Anthony. Brittany grabbed the child. Davis said it was too hot in the apartment, and the baby "might have been up under the cover." Brittany did not think the apartment was too hot.
An emergency call was placed and Brittany rode to the hospital in the ambulance with Anthony. At the hospital, a nurse told her that Anthony "was gone" and she "fell out." Brittany was taken to her uncle's house. She learned the next day that Davis had been arrested. He called from jail to say he was sorry and "told her what he did to Anthony."
Garrett Wilson, a paramedic with the Shreveport Fire Department responded to the 911 call regarding Anthony. He testified at trial that, upon arrival, there was a lady on a balcony screaming, "What's wrong with my baby? Help my baby." There was a man present who at times was consoling the lady and at other times was "pacing around." The child was lying on a bed and did not have a pulse. The child had obvious bruising on the face and neck and along the jawline. Wilson picked the child up and took him to the ambulance, where pediatric advanced life support was initiated. The child was intubated, an IV was started along with CPR, and attempts were made to restart the heart. Anthony had distention, rigidity, and swelling in the abdomen. He was transported to LSU Health Sciences Center where he was pronounced dead.
Corporal Robert Morman with the Shreveport Police Department was called to secure a possible crime scene at the apartment. He was informed that a baby had been transported from the apartment to the hospital. Davis and Kentrell were at the apartment when Morman arrived. Davis was outside the apartment talking on the telephone with Brittany. Morman was told that the child had expired for unknown reasons. He remained at the apartment for approximately two hours before he was relieved by another officer.
Corporal Marcus Mitchell, a crime scene investigator with the Shreveport Police Department, went to the hospital and photographed Anthony's body. He also went to the apartment and made photographs of it and the bedroom where the child was found. Mitchell made a diagram of the apartment. There was no evidence of blood or bodily fluids at the scene.
Detective Joshua Mayfield with the violent crimes and homicide unit of the Shreveport Police Department investigated Anthony's death. He went to the apartment and then to the hospital to view the child. Both of Anthony's eyes were bruised. There was also bruising to the sternum, abdomen, back, and buttocks.
Mayfield spoke with Brittany in the family room at the hospital. She told him she had bathed the child that evening before she went to work and did not notice the extensive bruising. She stated that Anthony had one small bruise on the left side of his face where he hit a wall while playing. Anthony had been to the doctor for asthma on November 13, 2013, but Brittany did not note any problems with Anthony's *1129 breathing before she went to work. She said Davis told her it had been hot in the apartment and that Anthony was "breathing funny." Davis said he gave Anthony a breathing treatment.
Mayfield saw Brittany again after she had been told that Anthony died. Brittany was crying hysterically and was having a panic attack. She was being treated by a nurse. Mayfield had several people come to the police station, including Kentrell, Lisa, and Olivia Brown, a friend of Brittany. They all stated that Anthony was healthy and uninjured when Brittany left for work.
Davis was also brought to the police station. He signed a form consenting to the search of the apartment and was advised of his rights and questioned, even though he was not under arrest at that time. Mayfield was assisted by Detective Rod Demery in questioning Davis. According to Mayfield, Davis was deceptive in this first interview, and denied striking Anthony. An audio recording of the interview was played for the jury.
In the interview, Davis stated that he fed Anthony and put him to bed around 11:00 p.m. He then played dominoes and watched television. He and Kentrell fell asleep. Davis got up and checked on Anthony and found he was sweating and wheezing. Davis gave Anthony a breathing treatment for his asthma and Brittany arrived home around 1:00 a.m. He denied calling Brittany at work. Davis also repeatedly denied striking Anthony. When asked about the bruises on Anthony's face, Davis said the child fell down some stairs approximately one month previously and still had bruises. He originally lied to Brittany about the fall, but eventually told her the truth. The police informed Davis that Anthony's bruises were fresh. Davis again denied striking Anthony. Davis, who was 26 years old at the time of this offense, stated that he had four children. Regarding Anthony, Davis professed his love for the child and repeatedly said, "I'm flawless with that baby." According to Davis, Anthony did not cry a lot. Davis was told that an autopsy was scheduled that morning. Demery drove Davis home. The conversation during the car ride was recorded. Demery urged Davis to tell the truth about what happened to Anthony. Davis continued to insist that he did not harm the child.
Following the first interview with Davis, Mayfield went to the hospital to observe Anthony's autopsy. The autopsy was performed by Dr. Long Jin, an associate professor of pathology at LSU Health Sciences Center and an expert in forensic pathology. According to Dr. Jin, Anthony was 17 months old, 30 inches tall, and weighed 23.7 pounds. The autopsy revealed that Anthony suffered multiple blunt force injuries. He had multiple bruises or contusions on the scalp, face, abdomen, and back, including a purple bruise on the right side of the face lateral to the right eye, a pink bruise below the right eye, a small abrasion between the nose and upper lip, five ovoid contusions on the left cheek, multiple small, round and ovoid pink and red contusions over the abdomen, multiple small contusions on the top and front of the head, a small scalp contusion on the left side of the head over the ear, a small hemorrhage on the back of the head between the scalp and skull, and a focal intradural hemorrhage on the left temporal area of the head just inside the dura. Dr. Jin stated that the small, ovoid contusions were consistent with grabbing the child's face with the fingertips and the contusions on the top of the head could be from impact or from grabbing the child's head forcefully. Microscopic examination showed acute hemorrhagein the deep subcutaneous soft tissue. According to Dr. Jin, these injuries were fresh and occurred close to the time of death. There were no *1130 fractured bones or signs of prior injuries or abuse.
An internal examination revealed that there was a gaping laceration on the inferior aspect of the liver that was 3.5 centimeters in length. The liver had a rupture of the tissue with significant mesenteric hemorrhage. Dr. Jin explained that the soft tissue in that area has a lot of small blood vessels and injuries to the area cause significant bleeding. Anthony would have had a total of 800 milliliters of blood in his body. Because of his injuries and resulting hemorrhage, his abdominal cavity contained 250 milliliters of blood, or roughly 1/3 of the total blood volume in the child's body. There were bruises and contusions on the stomach inside the child's belly along with small contusions on the large and small intestines. There was a submucosal hemorrhage of the small intestine. Dr. Jin found a contusion on the stomach with acute hemorrhage in the gastric wall. There was also acute hemorrhage around the adrenal gland on the top of the kidney, close to the stomach and the mesentery. Dr. Jin testified that the laceration to the liver was caused by severe blunt force impact from outside the body, either from a direct strike from a fist or by grabbing the child. Dr. Jin testified that Anthony died from a massive internal hemorrhage caused by blunt force injuries. According to Dr. Jin, this was a homicide. Anthony was beaten to death and the injuries were inflicted in one incident.
Davis was picked up and taken back to the police station where he gave another statement. An audio recording was made, as well as a video recording made by Demery on his cellphone. In that interview, Davis appeared nervous. According to Mayfield, in the second interview, Davis had the attitude of "you got me." The recording was played for the jury.
At the beginning of the second interview, Davis was again advised of his rights. Davis said that the baby had been hollering and continued to holler after he was put to bed. Davis admitted that he struck the child in the stomach twice with a closed fist. He demonstrated how he struck the child. Davis said he was going through a lot of "personal stuff," such as not having a job, not being able to see his children, and the holidays were approaching. Davis said Anthony stopped crying after he hit him and the child had trouble breathing. Davis gave Anthony a breathing treatment.
Davis was arrested for first degree murder and was booked into jail. He made two telephone calls to Brittany from jail and those conversations were recorded. In those calls, Davis admitted to Brittany that he hit Anthony in the stomach and the chest. Those recordings were also played for the jury. Numerous photos depicting the injuries inflicted upon Anthony were admitted into evidence, along with a diagram and photos of the apartment.
The jury convicted Davis as charged of second degree murder. Davis filed a motion for "post verdict judgment of modification" urging that he was guilty only of manslaughter.[3] The motion was denied. Davis was ordered to serve the mandatory sentence, life in prison at hard labor without benefit of parole, probation, or suspension of sentence. He was given credit for time served and was properly informed of the time limits for seeking an appeal and post conviction relief.
*1131 On appeal, Davis argues that the evidence adduced at trial does not support a conviction for second degree murder. Davis admits striking Anthony in the abdomen twice. However, he urges that this did not show a specific intent to kill or inflict great bodily harm and that he could not have anticipated that his actions would have resulted in the damage caused. He also contends that his actions did not show the intent or negligence required for cruelty to a juvenile. Davis maintains that he lashed out, but did not anticipate the effect of his actions. Davis argues that the motion for "post verdict judgment of modification" should have been granted, and his conviction for second degree murder should be converted to a conviction for manslaughter. None of these arguments has merit.
LEGAL PRINCIPLES
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Small , 2011-2796 (La. 10/16/12), 100 So.3d 797 ; State v. Thornton , 47,598 (La. App. 2 Cir. 3/13/13), 111 So.3d 1130.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2d Cir. 2/25/09), 3 So.3d 685, writ denied , 2009-0725 (La. 12/11/09), 23 So.3d 913 ; State v. Thornton , supra ; State v. Givens , 45,246 (La. App. 2 Cir. 6/9/10), 41 So.3d 589.
Second degree murder is defined, in pertinent part, by La. R.S. 14:30.1, as the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... cruelty to juveniles [or] second degree cruelty to juveniles ... even though he has no intent to kill or to inflict great bodily harm.
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Allen , 41,548 (La. App. 2d Cir. 11/15/06), 942 So.2d 1244, writ denied , 2007-0530 (La. 12/7/07), 969 So.2d 619 ; State v. Lilly , supra ; State v. Thornton , supra . Specific intent to kill or inflict great bodily harm, as required to convict for second degree murder, may be inferred from the extent and severity of the victim's injuries. State v. Thornton , supra ; State v. Julien , 2013-1327 (La. App. 3 Cir. 5/21/14), 139 So.3d 1152, writ denied , 2014-1406 (La. 5/15/15), 169 So.3d 383.
Cruelty to juveniles is defined by La. R.S. 14:93(A)(1) as the intentional *1132 or criminally negligent mistreatment by neglect by anyone 17 years of age or older of any child under the age of 17 whereby unjustifiable pain or suffering is caused to said child. Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of 17 to any child under the age of 17 which causes serious bodily injury or neurological impairment to that child. La. R.S. 14:93.2.3(A)(1). The term "intentional" within the meaning of this statute requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Woods , 44,491 (La. App. 2 Cir. 8/19/09), 16 So.3d 1279, writ denied , 2009-2084 (La. 4/9/10), 31 So.3d 380 ; State v. Tensley , 41,726 (La. App. 2 Cir. 4/4/07), 955 So.2d 227, writ denied , 2007-1185 (La. 12/7/07), 969 So.2d 629. "Mistreatment," as used in this statute, is equated with abuse. State v. Brown , 47,050 (La. App. 2 Cir. 5/16/12), 92 So.3d 579, writ denied , 2013-2997 (La. 9/12/14), 147 So.3d 182 ; State v. Woods , supra .
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La. R.S. 14:12.
The offense of manslaughter is defined as a homicide that would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1) ; State v. Thornton , supra . Sudden passion and heat of blood are mitigatory factors in the nature of a defense which exhibits a degree of culpability less than present when the homicide is committed without them. State v. Lombard , 486 So.2d 106 (La. 1986) ; State v. Thornton , supra . The defendant bears the burden to prove, by a preponderance of the evidence, that he acted in sudden passion or heat of blood in order for manslaughter to be appropriate. State v. Thornton , supra .
Provocation and the time for cooling are questions for the trier of fact to determine according to the standard of the average or ordinary person. The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the evidence. State v. Thornton , supra ; State v. Free , 48,260 (La. App. 2 Cir. 11/20/13), 127 So.3d 956, writ denied , 2013-2978 (La. 5/30/14), 140 So.3d 1174, writ denied , 2014-0039 (La. 9/19/14), 148 So.3d 944.
DISCUSSION
The evidence in this case is more than sufficient to support Davis's conviction for second degree murder. The definition of second degree murder, set forth above, includes the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. The definition also includes the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles or the perpetration or attempted perpetration of second degree cruelty to juveniles, even though he has no intent to kill or inflict great bodily harm. Here, Davis's actions were sufficient to support his conviction under either category of the offense.
Specific intent is found where the offender desired the prescribed criminal consequences to follow his act or failure to act and may be inferred from the extent and severity of the victim's injuries. Davis admitted that he struck a defenseless infant *1133 in the stomach twice with a closed fist. Anthony's body also showed trauma to the face, head, and body. The bruises on the face and head appeared to be caused by Davis gripping the child's face and head with his fingers. Anthony had hemorrhaging on the back of the head between the scalp and skull and a hemorrhage on the left temporal area of the head inside the dura. The intestines and stomach were bruised with acute hemorrhage and there was also an acute hemorrhage around the adrenal gland on the top of the kidney. Dr. Jin testified that Anthony was beaten to death and that his injuries were inflicted in a single incident. Although the two intentional strikes to the abdomen admitted by Davis are sufficient to support his conviction for second degree murder, Anthony's injuries show that he was intentionally brutalized far beyond the behavior admitted by Davis. The severity of the injuries is sufficient to show that, in attacking the child, Davis had the specific intent to kill or inflict great bodily harm.
The evidence also shows that Anthony died as a result of Davis's perpetration of cruelty to a juvenile or second degree cruelty to a juvenile. The record shows that Davis intentionally abused Anthony by brutally beating him, causing him to bleed to death internally. Davis described how the infant had difficulty breathing following the beating. Davis's intentional, abusive actions caused Anthony unjustifiable pain and suffering and resulted in his death.
Although the evidence amply shows that Davis is guilty of second degree murder, he argues that he is guilty only of manslaughter in this matter. The record simply fails to support his argument. To support a conviction for manslaughter, Davis had to prove by a preponderance of the evidence that he committed the offense in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Several witnesses testified that Anthony was a good baby who did not cry excessively. Kentrell, who was present in the apartment the entire evening, never heard any crying. While Davis told police that he had "personal stuff" going on, such as not being able to see his children and being out of work, these factors were hardly sufficient to provoke an average person to commit the savage, brutal beating of a helpless child. As stated in State v. Thornton , supra :
[T]he measure of the "provocation sufficient to deprive an average person of his self-control" cannot be met by reference to the crying and discomfort of an innocent [infant.] The average person understands that no anger, much less anger accompanied by force and harm, is a reasonable response to an infant.
Davis simply failed to prove that his actions constituted manslaughter only, and not second degree murder. As outlined above, the evidence in this matter was more than sufficient to support Davis's conviction for second degree murder and the trial court did not err in denying Davis's motion for post verdict judgment of acquittal.
CONCLUSION
For the reasons set forth above, we affirm the conviction and sentence of the defendant, Gerderrick Davis, for the second degree murder of Anthony Scott.
AFFIRMED.

La. R.S. 46:1844 W(1)(a), regarding confidentiality of crime victims who are minors and victims of sex offenses, provides in part that the public disclosure of the name of the juvenile crime victim by any public official or officer or public agency is not prohibited when the crime resulted in the death of the victim.

Kentrell is Brittany's brother, who was 11 years old at the time of this incident, and was staying with his sister during the Thanksgiving break from school. In the trial transcript, he is referred to as Kentrell. There are other indications in the record that his name is Hentrell. In this opinion, we will use the spelling in the transcript.

Davis's motion is actually a motion for post verdict judgment of acquittal, which allows for acquittal if the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty, or modification of the verdict to render a judgment of conviction of a lesser included responsive offense if the evidence supports only a conviction for the lesser included responsive offense. See La. C. Cr. P. art. 821.