620 So.2d 508 (1993)
STATE of Louisiana
v.
Bennie J. BROWN.
No. 92-KA-1337.
Court of Appeal of Louisiana, Fourth Circuit.
June 15, 1993.
*509 Harry F. Connick, Dist. Atty., Susan M. Erlanger, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
Kevin V. Boshea, New Orleans, for defendant-appellant.
Before SCHOTT and BARRY and JONES, JJ.
SCHOTT, Chief Judge.
Defendant was convicted of aggravated rape and aggravated burglary. His motions for a new trial and post-verdict judgment of acquittal were denied and he was sentenced to life imprisonment for the rape and thirty years for the burglary.
At approximately 9:00 p.m. on February 10, 1991, police officers received a call of a rape and found the victim at her neighbor's house. She told them that she had been anally raped, and she described her attacker *510 as a black man approximately 5'10" tall, with a mustache and a beard and with short hair. She did not identify the attacker. Although there were no signs of forced entry into the house, the lock on the back door was broken.
The victim was taken to Charity Hospital where a rape examination was performed. The examining physician, Dr. Waltrip, found no evidence of trauma to her rectal area, but she suffered from a lack of muscle tone in that area. Dr. Waltrip testified that due to this lack of muscle tone, the victim could have been raped without exhibiting any trauma in that area. Examination of the victim with a Woods lamp was inconclusive for the presence of seminal fluid.
Dr. Shelton Barnes, testified that he had treated the victim the week prior to the rape for a case of severe fecal impaction. The methods of treatment included the administration of enemas, prothoscope examination, and a colonoscopy, and these treatments would have caused a lack of muscle tone in her rectal area. He stated that if she had been raped shortly after being treated she could possibly suffer no trauma to the rectal area.
Although the victim told the police on the night of the rape that she did not know her attacker, later that month her mother contacted officers investigating the case and told them that the perpetrator could have been one of the "Brown boys" who lived diagonally across the street from the victim's house. After some investigation, the police learned that the defendant Bennie Brown matched the description given by the victim. She gave the name Bennie Brown as her attacker, and a warrant was issued for his arrest. A few months later the victim positively identified him from a photographic lineup.
At trial, the victim testified that at the time of the rape, she was living in the 1800 block of Gentilly with her mother, an older brother, and a younger brother and sister. She testified that she knew the defendant from seeing him in the neighborhood, that she knew his voice, and that she went to school with his daughter. She testified that on the night of the rape, she stayed home while the rest of the family went to a Mardi Gras parade. The front door was locked, but the back door could be secured only by a slide latch because the lock had been broken. She testified that she had fallen asleep watching television in her mother's bedroom, which was the second room from the front of the house. She awoke when the light in the room was turned off. She got off the bed and someone jumped on her back. She screamed, and her attacker placed a hand over her mouth and a gun to her head, and he threatened to shoot her if she screamed. She had heard her attacker's voice before, but she could not place his identity. From the light of the television, she could tell that he had a beard and a moustache, even though he remained behind her.
The victim testified that the man then took her into the adjoining living room, where the light was still on, and she got a look at his face, which she recognized as belonging to a man who lived across the street. She did not, however, know his name at that time. She heard a door slam, and he looked out the window and turned off the light. A young neighbor came up on the porch, but he left when his sister called him. The assailant told her that he had two bullets in his gun, one for her and one for whoever came in the front door. She tried to get to the front door, but he pulled her away and forced her to get down on her hands and her knees. He forced her at gunpoint to undress and then raped her anally. When he had finished, he told her to lie on the floor and he covered her with a towel. He told her not to tell anyone what had happened or he would kill her little brother and sister. He also told her not to move for five minutes or he would shoot her. He then patted her on the back, called her "poor baby", and ran to the back of the house.
The victim further testified that she grabbed her clothes and fled out the front door. She went next door to get help, but when no one answered, she went to the house of another neighbor who was a friend of her older sister. She would not *511 let the neighbor call the police because of the threat the man had made, but she called her sister and told her what had happened. The police were then notified, and when they arrived she gave them a description of her attacker, but she did not identify her attacker because she was afraid he would harm her younger siblings. Two weeks after the rape she identified her attacker to a friend, who then told the victim's mother. She did not tell anyone who had raped her prior to this because her mother and siblings were still living on Gentilly, although she was staying with relatives in another part of the city. She denied that anyone suggested to her that her attacker was the defendant. She chose his photograph out of a lineup conducted at her aunt's house, and she positively identified him at trial as the man who broke into her house and raped her.
Portions of the victim's testimony were corroborated by testimony of: her brother who was the last person to leave the house prior to the rape; the neighbor to whose house she fled after the rape; her sister who she called from the neighbor's house; and her mother. The victim's sister and her neighbor both testified that she told them not to call the police because the assailant had threatened to harm her siblings. The sister testified that she asked her if her attacker could have been someone in the neighborhood, but she did not reply. The sister denied, however, suggesting to the victim that the defendant was the perpetrator.
The victim's mother testified that although she did not identify her attacker at first, the mother wondered from the description given if he could have been one of the "Brown boys" who lived across the street from them. She stated that one of the officers investigating the rape told her that it might have been committed by someone who lived in the area and who had been watching the house, but she denied passing this supposition on to the victim. She testified that a few weeks after the rape, the victim's friend told her that the victim had told her that "Rolanda's daddy" had raped her.
Bennie Brown, Sr., the defendant's father, testified that on February 10th, he drove his son and his son's girlfriend to her daughter's house on S. Rendon Street at approximately 7:00 p.m. He did not know what time the defendant returned home, as he was sleeping at the time, but the defendant was back home by the next morning. Sabrina Bertrand, the defendant's girlfriend, testified that the defendant's father dropped them off at her daughter's house around 7:30 p.m. She insisted that the defendant did not leave her daughter's house until sometime between 11:00 p.m. and midnight. She also admitted that the defendant wore a beard at that time.
The defendant Bennie Brown, Jr. denied raping the victim or even having ever been in her house. He testified that on the day of the rape, his father took him and Ms. Bertrand to her daughter's house at approximately 7:00 p.m. He remained there until approximately 8:20 p.m., when he left to watch the parade on Canal Street. He met some people on the way, however, and he never actually made it to the parade. Instead, he went to a bar on Galvez Street to play pool. He left the bar at approximately 9:45 p.m. and he ran into an acquaintance while walking back to Ms. Bertrand's daughter's house. When he was arrested by the police, they also searched his house, and the only gun which was found was an inoperable double gauge shotgun with a broken stock.
Willard Smith testified that he saw the defendant outside a bar that evening. He testified it was "late" when he saw him. He also testified that on that date the defendant had a beard.
A review of the record for errors patent reveals no indication that an arraignment was ever held. C.Cr.P. art. 831 provides in part that a defendant must be present at arraignment and when a plea is given unless, he voluntarily absents himself. However, art. 832 provides that "the defendant may always object to his absence at the arraignment or plea to the merit, provided the objection is made before the commencement of trial." Art. 555 provides in part: "A failure to arraign the defendant *512 or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pled not guilty." Here, the defendant did not object to any lack of arraignment, nor does he allege it as error now. As such, the failure of the record to show that defendant was arraigned on the charges in this case is harmless error. State v. Bray, 548 So.2d 350 (La. App. 4th Cir.1989).
In addition, the trial court sentenced the defendant without first ruling on his motions for new trial and for post-verdict judgment of acquittal or modification of verdict, in contravention of C.Cr.P. arts. 853 and 861. These motions were eventually heard on remand from this court. Because they were pending at the time of sentencing, the appellant's sentences must be vacated and the case remanded for resentencing. See State v. Randolph, 409 So.2d 554 (La.1981); State v. Moran, 584 So.2d 318 (La.App. 4th Cir.1991), writ den. 585 So.2d 576 (1991).
There are no other errors patent.
By his first assignment of error, defendant contends that the trial court erred by denying his motion for new trial based upon the State's failure to produce Brady material. Specifically, he argues that the State failed to inform him of the anticipated testimony of Dr. Barnes and to produce the medical records of his treatment of the victim. The appellant contends that the evidence presented by Dr. Barnes, explaining the victim's lack of anal tone, was exculpatory in that it explained the presence of the only indication that a rape had occurred. He maintains that had he known of this evidence, his trial strategy would have changed in that he would have argued that no rape had occurred.
Although the record does not reflect an objection, exception or motion for mistrial in connection with the testimony we have considered this assignment in the context of defendant's argument that the trial court erred by denying his motion for new trial based upon the newly-discovered evidence, Dr. Barnes' explanation for the victim's lack of anal tone, which the appellant contends was exculpatory evidence and not produced prior to trial. His argument is grounded on two theories: (1) the evidence was specifically requested, and as such, the State had the duty to produce it; and (2) even if this evidence was not specifically requested, it was exculpatory evidence which the State was obliged to produce.
With respect to the first ground, C.Cr.P. art. 718 provides in part that upon the defendant's motion, the court shall order the State to allow the defense to
inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
(2) are intended for use by the state as evidence at the trial
Art. 719 likewise provides for the inspection, etc. of "any results or reports, or copies thereof, of physical or mental examination... made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial." The appellant argues that the State should have produced Dr. Barnes' medical records of the victim when it became aware of their existence, which the prosecutor testified was approximately three days prior to trial.
Defendant's motion for bill of particulars and discovery and inspection requested the date, time, place, and results of any examinations or tests upon "any physical evidence, objects, materials and/or substances" which the State intended to use in its prosecution of the case, as well as nature and description of these objects and the names, titles, and addresses of anyone who conducted these tests. The state's response was: "See crime lab reports provided." In addition, defendant twice requested *513 the issuance of subpoenas duces tecum to Charity Hospital, the first time for any documents, including the "route sheet" pertaining to the victim when she was treated after the rape, and the second time for any documents relating to her.
The victim's medical records concerning her treatment by Dr. Barnes' were not introduced at trial, and there is no indication that Dr. Barnes used them at trial to refresh his memory. There is no indication that the State ever possessed such records. At the hearing on defendant's application for new trial the prosecutor testified that the State never had them. The State could not wrongfully fail to produce records it never had. In the cases cited by defendant the state did have possession of documents but wrongfully failed to disclose them.
Defendant alternatively argues that the defense should have been apprised of the evidence presented by Dr. Barnes because of its exculpatory nature. Defendant relies on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in which the court held that the prosecution must disclose evidence favorable to the defendant if such evidence is material to his guilt or punishment and if the evidence, if suppressed, would deprive him of a fair trial. As this court noted in State v. Heck, 560 So.2d 611, 617 (La.App. 4th Cir.1990), writ den. 566 So.2d 395 (1990), materiality is shown where there is a `reasonable probability' that the outcome would have been different if the evidence had been disclosed to the defense. Defendant argues that the only physical "evidence" of the rape was the victim's lack of anal tone which Dr. Barnes attributed to the treatment she received for fecal impacting and had his counsel known there was a non-rape explanation for it, he would have argued to the jury that no rape had occurred. He maintains that the State's failure to inform the defense of the victim's condition and Dr. Barnes' anticipated testimony, therefore, deprived him of the right to present the "no rape" defense.
However, the testimony of Dr. Barnes, was not exculpatory. He testified that due to the procedures and treatment the victim received, he would expect that her anus would be dilated on the day of the rape with the result that she might not sustain any damage to her rectal area if she had been anally raped. Dr. Waltrip testified that when she examined the victim after the rape, she found no trauma to the rectal area. In addition, she noticed a decrease in anal tone, and she testified that given the victim's recent medical history, the lack of trauma to the victim's rectal area did not rule out the possibility that she had been anally raped. Dr. Waltrip testified that normally a decrease of anal tone would not result from a rape; rather she testified: "If someone has been violated anally, and this is not an accustomed thing, that a patient has actually has [sic] an increase in sphincter tone, secondary to smuffled [sic] spasm." Dr. Waltrip further testified: "The tone and the fexicity of [the victim's] anal sphincter, yes, was unusual for a patient who had been anully [sic] raped."
Thus, contrary to the defendant's assertions, the lack of anal tone could not be considered to be "evidence" of the rape. According to Dr. Waltrip, an increase in anal tone would normally result from anal violation, not a decrease as the victim had. Thus, another explanation for the victim's decrease in anal tone would not destroy the only physical evidence of the rape, as claimed by the defense, because this lack of tone was not an indication that the rape had occurred. Nor did its presence exclude the possibility that a rape occurred. Dr. Barnes' testimony was detrimental to the defense because it explained why there was no trauma to her rectal area in spite of the rape. Thus, the State did not fail to produce exculpatory evidence and this assignment is meritless.
By his second assignment of error, the appellant contends that the trial court erred by denying his post verdict judgment of acquittal. He alleges that the evidence adduced at trial did not support his convictions for aggravated rape and aggravated burglary.
C.Cr.P. art. 821 provides in part that a post verdict judgment of acquittal shall be granted only if the court finds that the *514 evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is akin to the often repeated standard for appellate review of the sufficiency of evidence to support a defendant's conviction that the court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
Defendant was convicted of aggravated rape and aggravated burglary. With respect to aggravated burglary, R.S. 14:60 provides that it includes unauthorized entry of any inhabited dwelling with the intent to commit a theft or felony therein, where the offender: is armed with a dangerous weapon; or after entering arms himself with a dangerous weapon; or commits a battery upon any person while inside or while entering or exiting. Defendant argues that the evidence was insufficient to support his aggravated burglary conviction because there was no evidence of a forced entry. However, the evidence need only show that the defendant entered without authorization; there is no need to show that the entry was a forced. Here, the victim testified that she was the only person who was home when the defendant entered the house and that she did not let him in or given him permission to enter the house. There was also testimony that the lock on the back door was broken and that not all of the windows locked. Given these factors, it appears the jury could have found that the defendant made an unauthorized entry into the victim's house. In addition, the victim testified that the defendant raped her at gunpoint. Based upon this testimony, the jury could very well have found sufficient evidence of aggravated rape beyond a reasonable doubt.
The major component of the appellant's sufficiency argument, however, is based upon his argument that there was insufficient evidence to prove that he was the man who broke into the victim's house and raped her or to prove that a rape did indeed occur. Acknowledging that the victim testified that the intruder anally raped her, he argues that the lack of corroborating physical evidence renders this testimony suspect. The testimony of the victim, without corroborating physical evidence, is sufficient to establish that a rape occurred. State v. Wright, 598 So.2d 561 (La.App. 4th Cir.1992). Thus, the lack of physical corroborating evidence would not defeat a jury's finding that a rape occurred.
Defendant next argues that the evidence was insufficient to prove that he was perpetrator of the burglary and rape. He argues that no one observed him entering or leaving the victim's house; the victim failed to tell anyone that he was the perpetrator until almost a month after the rape, although he was a neighbor; and on the night of the rape, the victim told the police and her family that she did not recognize her attacker. He points to testimony from the victim's mother that from the victim's description she thought that the perpetrator might be "one of the Brown boys", and he maintains that this suggestion led the victim to identify him as the perpetrator. However, the victim's mother testified that she did not share her suspicions with the victim, telling only her older daughter. That daughter testified that she only asked the victim if the perpetrator was someone in the neighborhood, and the victim refused to answer. She also did not remember if her mother had mentioned to her the name "Brown" prior to the victim's identification of the appellant. More importantly, the victim testified that she did not identify the appellant right after the rape because he had threatened to kill her younger siblings if she told the police that he raped her. She testified that although she never lived in the house on Gentilly after the rape, her mother and siblings remained there, and she feared for their safety.
Lastly, he argues that the victim could not have gotten a good look at her assailant because of the lighting conditions in the house. However, the victim testified that when the assailant took her into the living room, she got a good look at his face before he turned off the lights, and she kept sneaking looks at him while they were in the living room before the lights went out.
*515 The points raised by the appellant with respect to the victim's belated identification of the appellant and her opportunity to see her attacker's face were fully raised before the jury. The jury apparently chose to believe the victim's testimony. A trier of fact has great discretion in its determination of the credibility of witnesses, and such determination will not be disturbed unless it is clearly contrary to the evidence. State v. Cashen, 544 So.2d 1268 (La.App. 4th Cir.1989). Such is not the case here. The victim positively identified the appellant as the man who anally raped her while armed with a gun. See R.S. 14:42 A(3). Therefore, there was sufficient evidence to support the jury's verdict. The trial court did not err by denying the appellant's motion for post-verdict judgment of acquittal. This assignment has no merit.
Accordingly, the convictions are affirmed. However, because his motions for new trial and for post-verdict judgment of acquittal were not ruled upon prior to sentencing, the sentences are vacated and the case is remanded for resentencing.
AFFIRMED.