STEPHENS, J.
This criminal appeal by the State of Louisiana arises from the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana. Defendant Eric Dominic Nabors was charged with second degree murder in violation of La. R.S. 14:30.1 and was convicted by a unanimous jury of second degree murder. Nabors filed a motion for post verdict judgment of acquittal. The trial court modified the jury's verdict, found Nabors guilty of the responsive verdict of negligent homicide, and sentenced him to serve five years at hard labor. No motion to reconsider sentence was filed. The state now appeals. For the following reasons, we reverse the trial court's modification of the jury's verdict, vacate the sentence imposed by the trial court, reinstate the jury's verdict, and remand to the trial court for sentencing in accordance with Nabors' conviction of second degree murder.
FACTS
On November 29, 2013, officers with the West Monroe Police Department ("WMPD") were dispatched to Glenwood Regional Medical Center, West Monroe, Louisiana, in reference to the death of a two-year-old child, Jemarion Jackson, who sustained severe injuries while in the care of Nabors. Following an investigation by WMPD, Nabors was indicted by a grand jury for the second degree murder of Jemarion *1217 and possession of marijuana.[1] Nabors pled not guilty to both charges at arraignment.[2] A jury trial commenced on April 6, 2017, wherein 14 witnesses testified, all called by the state. Notably, the trial court's charge to the jury defined direct and circumstantial evidence and clearly discussed the burden of proof with regard to both types of evidence. Furthermore, the charge to the jury identified manslaughter and negligent homicide as responsive verdicts to the charge of second degree murder and provided definitions of both. During deliberation, the jury requested the trial court provide the definitions of guilty as charged, guilty of manslaughter, and guilty of negligent homicide. In response, the trial court reread to the jury those portions of the original charge. The jury later made a second request for the definition of manslaughter. The trial court again reread to the jury the portion of the original charge that defined manslaughter. Thereafter the jury made a third and final request that read as follows: "Please clarify if manslaughter means the intent to harm. If so, if it's irrelevant. Can we have an example of manslaughter?" The trial court informed the jury that it could not provide an example and, again, reread the portion of the original charge that defined manslaughter. After deliberation, the jury unanimously returned a verdict of guilty as charged of second degree murder.
Prior to sentencing, Nabors filed a "Motion for Post Verdict Judgment of Acquittal and/or Alternatively a Verdict of a Lesser Included Responsive Verdict Under La. C. Cr. P. art. 821." The state filed an opposition, and a hearing on the motion was held. In oral argument, the state emphasized the deference owed to the jury's verdict, noting that the jury was contemplative, alert, and engaged during the entire trial, particularly during the testimony given by the medical experts. The state further argued that the fact the jury came back three times to request the definitions of the responsive verdicts demonstrated they strongly considered all of the options before them before returning a unanimous verdict of guilty as charged. The trial court subsequently determined that it needed to review the transcript of trial testimony given by the forensic pathologist who performed the autopsy, Dr. Jennifer Forsyth, then ultimately overturned the jury's verdict and found Nabors guilty of negligent homicide. Upon ruling, the trial court stated that it reviewed the evidence in a light most favorable to the state and found that the evidence only supported a conviction of negligent homicide, as there was no direct evidence demonstrating that Nabors inflicted the injuries suffered by Jemarion or that Nabors was the only person who had access to Jemarion in the hours before his death. The trial court concluded that Nabors' negligent supervision of Jemarion, however, indirectly contributed to his death. In support of its ruling, the trial court explained, in pertinent part:
Having read the testimony of Dr. Forsyth, in here she could not pinpoint, you know, the timeframe of some of the injuries the child had, but the conclusion that there were multiple blunt force injury or trauma to the-to the child. As to when it occurred, it was not clear at to whether it occurred on mo-on that date, but there was some indication they were old bruises to the child's body and she described the process by which she made that determination as to whether or not there was, I guess, coagulation of *1218 stuff around the specific injury that would indicate that it was recent or occurred, you know, hours before the child was seen by a-a physician. What stands out here is she said there were a lot of injuries to the child. Now the evidence at-at the-at the trial I heard no evidence at the trial as to any actual injury being committed by Mr.-Mr. Nabors, except a neighbor heard a bump.
....
But there's no indication here that on this date in question the he-he or she or anybody who had-who had disciplined the child and what happened to that child during that time period, I think it might have been-I don't know if it was two hours that the child was left alone by Mr. Nabors, and who had access to the child, even though the-the State came in on that issue and said, well there was only one person that had the key and that was Mr. Nabors to the-to the apartment. But the-the thump heard by the neighbor is not-was not sufficient to establish that these injuries were inflicted by Mr. Nabors or when these was inflicted. All we know is that it was inflicted during the time-during that that he had the child under his care and therefore the court finds that a lesser verdict could be rendered here and find him guilty of negligent homicide.
Nabors was subsequently sentenced to five years at hard labor. No motion to reconsider sentence was filed, and the state now appeals.
DISCUSSION
The state asserts that the evidence presented at trial was sufficient to establish Nabors' guilt of second degree murder and the trial court erred in modifying the jury's unanimous verdict and finding him guilty of the responsive verdict of negligent homicide. Relying on State v. Voorhies , 590 So.2d 776 (La. App. 3 Cir. 1991), the state argues that the trial court incorrectly applied the motion for new trial "thirteenth juror" standard of review by substituting its own differing judgment on the evidence for that of the jurors, disregarding the state's evidence as a whole. The state urges that the trial court should have applied a standard similar to Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), and examined the sufficiency of the evidence. We agree and find the following testimony and evidence presented at trial was more than sufficient to support Nabor's conviction of second degree murder.
Trial Testimony
The state's first witness was Captain Jennifer Worley Smith of WMPD, who testified that she was dispatched with Officer Chad Grubbs to the hospital at approximately 10:30 p.m. on November 29, 2013, in connection to a deceased child. Upon arriving at the hospital, Cpt. Smith and Ofc. Grubbs made contact with Dr. Nicholas Slade Smith, Jemarion's mother, Nakiyah Jackson,[3] and her boyfriend, Nabors. Captain Smith determined that the injuries leading to Jemarion's death occurred in West Monroe, contacted Detective Tommy Jones, the on-call investigator, and remained at the hospital until he arrived. Officers were dispatched to the location where the injuries occurred, an apartment in West Monroe, Louisiana, to secure the residence in case it was determined that a crime occurred. Captain Smith identified Nabors in open court as one of the *1219 people she spoke with at the hospital. A few hours after leaving the hospital, Dr. Smith called the police department, spoke with Cpt. Smith and indicated that he believed Jemarion's injuries were not accidental.
Officer Grubbs corroborated Cpt. Smith's testimony, adding that Nabors brought Jemarion to the emergency room. Officer Grubbs did not take any statements from Nabors; however, he transported Nabors to the police department at Det. Jones' request. After placing Nabors in a police interview room, Ofc. Grubbs accompanied Detective Paul Blunschi to the apartment to take photographs and preserve possible evidence.
Dr. Smith testified that he was working in the hospital's emergency room and attempted to resuscitate Jemarion on the night he died. Dr. Smith recalled a woman running into the emergency room screaming that her child was not breathing. Nabors carried Jemarion into an exam room, and Dr. Smith observed Jemarion vomit on Nabors' jacket. Nabors left the exam room after placing Jemarion on the bed. Dr. Smith observed that the child was cold to the touch, was not breathing, and had no heartbeat. He also observed bruises on Jemarion's torso, back, leg, face, and scalp. Jemarion's body temperature was 86 degrees upon arrival at the hospital. Dr. Smith noted that although he witnessed Jemarion vomit on Nabors' jacket, the movement of gases in the body make it common for a person to vomit after death. Jemarion was pronounced dead at 11:10 p.m. following 30 minutes of CPR.
Dr. Smith testified that the X-rays and CAT scans of Jemarion's body revealed gastric and intestinal distention, a questionable liver abnormality, abdominal and pelvic fluid, possibly blood, no osseous injury, and air in the spinal canal. According to Dr. Smith, air in the spinal canal indicates that there is a leak or tear in a viscus organ, and air has leaked out of those into places where there should not be air. Dr. Smith noted that air in the spinal canal has multiple causes, trauma being a major example. CAT scans of Jemarion's chest revealed possible rib fractures, swelling or fluid accumulation in his lungs, and scattered free air. A scan of Jemarion's head also revealed soft tissue swelling of the frontal scalp, swelling throughout his brain, scattered intracranial air, but no skull fracture. Jemarion also had bruises on his body that were in various stages of healing. In his professional opinion, Dr. Smith believed only physical trauma could have caused Jemarion's injuries.[4]
Dr. Jennifer Forsyth, a forensic pathologist, testified that she performed Jemarion's autopsy. Like Dr. Smith, Dr. Forsyth testified that Jemarion's body showed significant external and internal signs of blunt force trauma. Jemarion had numerous bruises and scrapes to his head but no skull fractures. There was a significant amount of blood in between his brain and skull, and his brain was swollen. Dr. Forsyth stated that the average two-year-old has one liter of blood in his body, and Jemarion's autopsy revealed 750 milliliters of blood in his abdominal cavity caused by lacerations to his liver and his mesentery (a fold of membrane that attaches the abdominal organs to the abdominal wall). Jemarion also had several bruises on his heart, thymus gland, and both lungs. Several of Jemarion's ribs were fractured on his left side and the left side of his back. Dr. Forsyth stated that she did not believe *1220 the ribs were broken during resuscitative efforts by hospital personnel because such injuries would then have been on the front of Jemarion's body, not his back. The knuckle on Jemarion's right hand was dislocated, and Jemarion had bruises on the right side of his face, on his lower back, and older bruises on the back of his left leg. Dr. Forsyth noted that the bruise on Jemarion's leg was consistent with being struck by the loop of a belt or cord that is folded in half, and added that it is difficult to injure oneself behind the knee or on the lower back. Dr. Forsyth also observed bruises and small cuts on the inside of Jemarion's lips consistent with something being pressed over his face and trying to move his head away. Jemarion had a blood alcohol level of 0.066, and Dr. Forsyth noted a strong smell of alcohol when she performed the autopsy.[5]
Dr. Forsyth testified that she did not believe the injuries suffered by Jemarion were accidental or self-inflicted and further noted that the bruises on Jemarion's body exceeded those typical of a two-year-old who is still learning to walk. Rather, she opined that Jemarion's death was caused by multiple blunt-force injuries which contributed to his internal injuries. Dr. Forsyth further stated that while swelling in the brain may take hours to develop after an injury, blood coming from a tear in the liver would have killed him within minutes, "probably not hours."
Detective Jim McGrew, who was an officer with WMPD at the time of the investigation, testified that he assisted Det. Jones during Nabors' police interview and corroborated that Nabors and Jackson consented to their apartment being searched.[6] He further confirmed that Nabors was advised of his Miranda rights at 1:20 a.m. and again at 4:12 a.m. on November 30, 2013, and Nabors did not appear intoxicated.[7] Detective Paul Blunschi verified the recordings of Nabors' police interviews played in court were correct.[8]
Mark Parker, the investigator for the Ouachita Parish Coroner's Office, testified that he was contacted by Glenwood Hospital personnel in response to Jemarion's death. Parker stated that he works independently from law enforcement; however, he did view and photograph Jemarion's body and interview family members at the hospital, including Nabors.[9] Nabors told Parker that he put Jemarion down for a nap between 5:00 and 5:30 p.m. on November 29, 2013. Nabors also took a nap and awoke around 8:00 to discover that Jemarion had vomited on himself. Nabors cleaned Jemarion up in the bathroom, but Jemarion began patting himself on the chest. Nabors informed Parker that Jemarion passed out and struck his head on the bathroom floor. Nabors claimed that he called 911 several times without success and drove Jemarion to the hospital around 8:30 p.m. Parker wrote and submitted a report detailing his findings to the pathologist.[10]
Jackson, Jemarion's mother, testified that Jemarion was born on October 27, 2011, and was two years old when he died.
*1221 Jackson stated that she, Jemarion, and Nabors lived in a studio apartment, Apartment A at 111 Filhiol Avenue, in November 2013. On the day Jemarion died, Jackson lent her cell phone to Nabors because Nabors' phone had been disconnected. That day Jackson worked as a cashier at Wal-Mart between 2:00 p.m. and 11:00 p.m. Prior to going to work, she fed Jemarion breakfast, watched cartoons with him, and talked with him. Nabors was with them, and later that morning, the three visited Nabors' mother. Jemarion played with a younger child while at the house, but Jackson stated he did not fall or injure himself while playing. According to Jackson, Jemarion suffered from acid reflux for which he had previously been hospitalized twice but was in good health when she went to work.[11] Around 3:00 p.m., Jackson left work and accompanied Nabors to the social security office but it was closed, so they visited Nabors' mother again before Jackson returned to work. Jemarion accompanied them on the errand and did not appear to be in any pain or discomfort. Jackson called Nabors at 8:00 p.m. to check on Jemarion. Nabors informed her that "he was going to whoop him because [Jemarion] vomited and used the restroom on himself." Jackson advised Nabors to give Jemarion his acid reflux medicine. At 10:30 p.m., Nabors called Jackson and told her that Jemarion was unconscious, and he was already waiting for her outside the Wal-Mart to take her and Jemarion to the hospital. Nabors was driving his mother's vehicle and holding Jemarion at the same time.
On cross-examination, Jackson was questioned about her autistic brother, who was close in age to Jemarion, and whether Jemarion would mimic the brother's behavior. Jackson stated that Jemarion would flush toilets like her brother, but Jemarion would never hit his head like her brother. Jackson also testified that Nabors drank but denied seeing alcohol in the home on the day Jemarion died.
Erica Nabors, Nabors' twin sister, testified that Nabors drove her to work in their mother's red Ford Focus on the morning that Jemarion died. Nabors, accompanied by Jemarion, picked her up from work at approximately 4:00 p.m. later that day, and the three of them picked up Erica's boyfriend, Antoine Washington, from his job. Erica testified that Jemarion was sitting in the backseat but was not in a car seat. Nabors drove to a friend's house to collect a phone charger, and the group returned to Nabors' apartment. Nabors and Jemarion went into the apartment, and Erica and Washington left in the car to run errands. At 8:43 p.m., Erica received a call from Nabors, and Erica and Washington picked him up at his apartment. Nabors told Erica that Jemarion was with his grandmother, which Erica thought was odd because Jemarion's mother and grandmother did not get along. Erica took Nabors to a convenience store, and Nabors-now driving-dropped Erica and Washington off at their apartment. Erica learned later that night of Jemarion's death and went to the hospital where she was interviewed by the police.
Demartez Nabors, Nabors' cousin, testified that he visited Nabors, Jackson, and Jemarion at their apartment on the morning Jemarion died. Demartez accompanied the three of them to take Jackson to work. Demartez remained with Nabors and Jemarion until they picked up Jackson around 3:00 p.m. They later took Jackson back to work, and Nabors dropped Demartez off on Georgia Street, Monroe, Louisiana, between 5:30 p.m. and 6:00 p.m. Around 9:00 *1222 p.m., Demartez received a call from Nabors asking to meet him at Nabors' mother's house on South 7th Street in Monroe to return the keys to the house. Demartez met Nabors around 9:30 p.m. Nabors was standing in the yard and did not have Jemarion with him. Demartez could not see if Jemarion was inside the red Ford Focus Nabors had driven there. Demartez testified that he did not hurt Jemarion when he saw him, and Jemarion appeared to be fine earlier in the day.
Melody Jolly testified that she was living next to the apartment where Nabors, Jackson, and Jemarion lived, and the two apartments shared a wall. On the night Jemarion died, Jolly, her daughter, and her sister were sitting in their living room when she heard bumping and loud noises coming from Apartment A between 9:00 p.m. and 10:00 p.m. Jolly was sleeping in her recliner when the noises woke her up, and she banged on the shared wall to make the noise stop. She learned the following day that Jemarion had died.
Ida Truelove, the asset protection manager of the Wal-Mart where Jackson worked, provided Det. Jones with a copy of Wal-Mart's security footage recorded on November 29, 2013. Truelove confirmed that Jackson was working that day but took a break at some point.[12] The footage was played for the jury and depicted Jackson leaving work with Nabors in the red Ford Focus and returning to Wal-Mart at 3:44 p.m. The footage further showed Nabors returning to Wal-Mart around 10:38 p.m. and Jackson running down the alley to Nabors' vehicle, presumably to take Jemarion to the hospital.
Detective Paul Blunschi of WMPD testified that he searched and photographed the apartment. Detective Blunschi identified the photographs during his testimony and stated that he collected a washcloth with suspected blood on it from the bathroom. Other than the washcloth, Det. Blunschi did not observe blood anywhere else in the apartment. A child's T-shirt, child's socks, and a green bedspread with vomit on it were also collected during the search.
Deputy John Asmussen testified that he assisted Det. Jones by evaluating the phone records requested from the cell phone carrier. The records revealed that Nabors made and received several calls on the night Jemarion died, and also provided the approximate location of the cell phone used by Nabors during these calls. Deputy Asmussen determined that Nabors was not at the apartment at certain times on November 29, 2013. The phone records provided a cell tower area code, which in turn, provided a general two-to three-mile radius where the cell phone used by Nabors that evening was located.
Detective Jones testified that when he arrived at the hospital on November 29, 2013, he took photographs of Jemarion's body, collected Jemarion's clothing, and the zip-up hoodie Nabors wore when he brought Jemarion to the hospital. After Nabors was transported to the police station, he was advised of his rights and questioned by Det. Jones around 1:00 a.m.[13] Footage recorded during Nabors' interview was admitted into evidence and played for the jury. During the interview, Nabors stated that his sister dropped him *1223 and Jemarion off at their apartment at 5:30 p.m. or 6:00 p.m. on November 29, 2013, and he and Jemarion took a nap. Nabors stated that a while later, he woke up and heard what he thought was a burp from Jemarion. Nabors lay back down, but when he later got up, Nabors realized that Jemarion had thrown up on himself. According to Nabors, Jemarion appeared to cover up the vomit, and Nabors took Jemarion to the bathroom to help him vomit in the toilet. Jemarion was very weak, and Nabors said he washed Jemarion in the bathtub. Nabors claimed he put clean clothes on Jemarion and collected Jemarion's clothes and the bed sheets to be washed. Nabors told Det. Jones he propped Jemarion up to prevent him from lying down for fear that something might block his airways, but Jemarion began to throw up again, fell forward, struck his face, and did not move. Nabors related to the detective that he threw some water on Jemarion to see if he would respond and called Jackson to tell her that Jemarion was sick. According to Nabors, he collected Jackson from Wal-Mart, and they went to the hospital. Nabors admitted that he left Jemarion alone while the child was sleeping to be with his sister and her boyfriend, and stated he locked the door upon leaving. Nabors claimed that Jemarion was alive when he returned from dropping his sister off at her apartment. In the interview, Nabors said he occasionally spanked Jemarion but adamantly denied beating him the night he died. Nabors also told Det. Jones he did not know how the injuries to Jemarion's back occurred.
Detective Jones testified, like Det. McGrew, that Nabors did not appear intoxicated or under the influence of any drugs during the interviews. Detective Jones also stated that Nabors was not threatened or coerced into making a statement. During the interview, Nabors admitted to lying about being in the apartment with Jemarion but claimed that he lied to Erica and the detective about Jemarion being with his grandmother because he knew he should not have left Jemarion alone. Detective Jones confirmed that Jackson consented to a search of the cell phone she lent to Nabors and later obtained a search warrant to retrieve the phone's data from the phone carrier.
Standard of Review
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Bass , 51,411 (La. App. 2 Cir. 6/21/17), 223 So.3d 1242, writ not cons. , 2018-0296 (La. 4/16/18), 239 So.3d 830. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/6/09), 21 So.3d 297, 2012-0717 (La. 9/12/12), 98 So.3d 305. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Walker , 51,217 (La. App. 2 Cir. 5/17/17), 221 So.3d 951, writ denied , 2017-1101 (La. 6/1/18), 243 So.3d 1064. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Brown , 51,352 (La. App. 2 Cir. 5/2/17), 223 So.3d 88, writ denied , 2017-1154 (La. 5/11/18), 241 So.3d 1013.
*1224 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983) ; State v. Norman , 51,258 (La. App. 2 Cir. 5/17/17), 222 So.3d 96, writ denied , 2017-1152 (La. 4/20/18), 240 So.3d 926
Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Broome , 49,004 (La. App. 2 Cir. 4/9/14), 136 So.3d 979, writ denied , 2014-0990 (La. 1/16/15), 157 So.3d 1127. For a case resting essentially upon circumstantial evidence, that evidence must exclude every reasonable hypothesis of innocence. State v. Christopher , 50,943 (La. App. 2 Cir. 11/16/16), 209 So.3d 255, writ denied , 2016-2187 (La. 9/6/17), 224 So.3d 985.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Ward , 50,872 (La. App. 2 Cir. 11/16/16), 209 So.3d 228, writ denied , 2017-0164 (La. 9/22/17), 227 So.3d 827. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Hust , 51,015 (La. App. 2 Cir. 1/11/17), 214 So.3d 174, writ denied , 2017-0352 (La. 11/17/17), 229 So.3d 928. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa , 2005-0213 (La. 1/19/06), 921 So.2d 94, writ not cons., 2007-0077 (La. 9/21/07), 964 So.2d 321 ; State v. Hust , supra .
Legal Authority
Second degree murder is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm or is engaged in the perpetration or attempted perpetration of cruelty to juveniles or second degree cruelty to juveniles though he has no specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(2).
Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Thornton , 47,598 (La. App. 2 Cir. 3/13/13), 111 So.3d 1130. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. State v. Murray , 49,418 (La. App. 2 Cir. 1/14/15), 161 So.3d 918, writ denied , 2015-0379 (La. 4/8/16), 191 So.3d 582.
Cruelty to juveniles is defined by La. R.S. 14:93(A)(1) as the intentional or criminally negligent mistreatment by neglect by anyone 17 years of age or older *1225 of any child under the age of 17 whereby unjustifiable pain or suffering is caused to said child. Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of 17 to any child under the age of 17 which causes serious bodily injury or neurological impairment to that child. La. R.S. 14:93.2.3(A)(1). The term "intentional" within the meaning of this statute requires general criminal intent to cause a child unjustifiable pain and suffering. State v. Ricks , 49,609 (La. App. 2 Cir. 1/14/15), 194 So.3d 614, writ not cons. , 2016-1036 (La. 11/7/2016) 208 So. 3d 383. "Mistreatment," as used in this statute, is equated with abuse. Id.
Negligent homicide is the killing of a human being by criminal negligence. La. R.S. 14:32. Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances. La. R.S. 14:12. Louisiana C. Cr. P. art. 814 provides that negligent homicide is an appropriate responsive verdict to the charge of second degree murder.
A post verdict judgment of acquittal shall be granted only if the trial court finds that the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty. La. C. Cr. P. art. 821(B). This is similar to the standard for appellate review of sufficiency of the evidence to support a defendant's conviction in that the court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. State v. Brown, 620 So.2d 508, 513-514 (La. App. 4 Cir. 1993), writ denied , 1993-1939 (La. 10/16/93), 625 So.2d 1062 ; see also State v. Hampton, 1998-0331 (La. 4/23/99), 750 So.2d 867, 880, cert. denied , 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999). The reviewer may not substitute its own appreciation of the evidence for that of the fact finder. State v. Wiltcher , 41,981 (La. App. 2 Cir. 5/9/07), 956 So.2d 769. If the court finds that the evidence supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict motion, may modify the verdict and render a judgment of conviction on the lesser included responsive offense. La. C. Cr. P. art. 821(C). The state, upon the modification of a verdict or granting of a post verdict judgment, may seek review by invoking the supervisory jurisdiction of or by appealing to the appropriate appellate court. La. C. Cr. P. art. 821(D).
Sufficiency of the evidence
Here, the trial court's modification of the jury's verdict was an absolute abuse of discretion, and it was clearly wrong in finding there was not sufficient evidence to convict Nabors of second degree murder. In ruling on Nabors' motion, the trial court left out critical evidence during its recitation of the facts, including Jemarion's lacerated liver and mesentery and fractured ribs. This evidence is extremely significant in that Dr. Forsyth explicitly testified that while she could not pinpoint when certain bruises and abrasions occurred, the lacerated liver would have killed Jemarion within minutes rather than hours. This testimony importantly extinguished Nabors' suggested theory that the injury to Jemarion's liver could have occurred while playing with another toddler 12 hours prior to his death. Furthermore, the trial court conceded that the wounds received by Jemarion were not self-inflicted and acknowledged Melody Jolly's testimony *1226 that she awoke to loud noises coming from Nabors' apartment between the hours of 9:00 p.m. and 10:00 p.m. that night. However, it still concluded that Jemarion's injuries were not inflicted by Nabors, despite both the medical testimony from Dr. Forsyth clearly showing that Jemarion was killed by multiple blunt force trauma and the circumstantial evidence showing that only Nabors had access to Jemarion at the times the wounds were inflicted. Additionally in giving reasons for rejecting the jury's unanimous verdict, the trial court erroneously disregarded Jackson's testimony that she called Nabors at approximately 8:00 p.m. that night at which time Nabors stated that he was going to "whoop" Jemarion for vomiting and using the restroom on himself. The trial court also failed to mention Jemarion's blood alcohol level of 0.066.
Nabors' reliance on State v. Small , 2011-2796 (La. 10/16/12), 100 So.3d 797, is misplaced. In State v. Small, supra , the defendant left her two small children alone at home while she went to a friend's house to have a drink. During her absence, a fire broke out in her apartment, killing one child. The defendant was charged and convicted of second degree murder, which this court affirmed on appeal. On review, the Louisiana Supreme Court reversed her conviction, finding the defendant guilty of negligent homicide. The court stated, in pertinent part:
[W]e find that a conviction for second degree murder cannot be supported in this case, where defendant's criminally negligent act of leaving her young children alone in the middle of the night was not a "direct act" of killing, but was instead a criminally negligent act of lack of supervision which resulted in her child's death.
State v. Small, supra at 799. The court further stated:
We are mindful of the legislature's prerogative to allow a prosecution for second degree murder by including cruelty to juveniles based on criminal neglect as an underlying predicate felony. However neglect takes many forms, and neglect in the form of lack of supervision simply cannot supply the direct act of killing needed for a second degree felony murder conviction. To the contrary, causes where second degree murder convictions have been affirmed based on an underlying felony of cruelty to juveniles have not involved lack of supervision, but have involved some direct act of negligence .... In other cases in which a second degree murder conviction has been upheld based on cruelty to a juvenile, the defendant committed direct acts of abuse.
Id. at 810-11 (Citations omitted.).
The instant case is distinguishable from State v. Small, supra , because there the defendant did not cause the fire which ultimately killed one of her children. Here, although Nabors did leave the apartment to go to the convenience store and drive his sister and her boyfriend to their apartment before returning, it is not Nabors' lack of supervision that killed Jemarion-again, Dr. Forsyth's testimony is clear that the injuries to Jemarion were not self-inflicted. Furthermore, during the interview with Det. Jones, Nabors insisted that he locked the door to the apartment when he left Jemarion alone there, and no one else had a key. This is a fact the trial court recognized during its oral reasoning, but, again, apparently chose to ignore in making its ruling.
This case is more similar to State v. Davis , 51,807 (La. App. 2 Cir. 1/10/18), 245 So.3d 1125, 2018 WL 348442, where a child was left in the care of the defendant while the child's mother was at work, and the defendant beat the child, causing injuries *1227 almost as identical to those suffered by Jemarion. On review, this court upheld the defendant's second degree murder conviction, noting that the nature of the victim's injuries alone was sufficient to establish both specific intent to kill or inflict grievous bodily injury and that the child died as a result of the defendant's perpetration of cruelty to a juvenile or second degree cruelty to a juvenile. While the defendant in State v. Davis, supra , admitted to beating the child and Nabors made no such admission, the state presented Jackson's testimony that Nabors said he was going to "whoop" Jemarion for vomiting and having a bowel movement on himself, as well as Jolly's testimony that she was awakened by loud noises coming from Nabors' apartment where he was supposed to be looking after Jemarion
The evidence in this case is clear that Nabors had sole charge of Jemarion on the night he died and during that time, Jemarion received non-self-inflicted injuries that killed him. The definition of second degree murder includes the killing of a human being when the offender either has the specific intent to kill or inflict great bodily harm. The definition also includes the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of cruelty to juveniles or the perpetration or attempted perpetration of second degree cruelty to juveniles, even though there is no intent to kill or inflict great bodily harm. The severity of Jemarion's injuries alone-the lacerated liver and mesentery, brain swelling, and fractured ribs to his back-suggest they were inflicted at the very least through cruelty to a juvenile, which is sufficient to support a conviction of second degree murder. These injuries, combined with Nabors' admission that he had sole custody of Jemarion and Jackson and Jolly's testimonies, provide strong circumstantial evidence that Jemarion's injuries, and his ultimate death, were directly caused by Nabors, such that there is no reasonable hypothesis of his innocence.
While La. C. Cr. P. art. 821 provides the avenue for a trial court to modify a jury's verdict, it does not permit the trial court to substitute its judgment for that of the jury or bestow upon it unfettered veto power when the evidence presented to the jury, viewed in the light most favorable to the prosecution, reasonably permits the jury's verdict. Here, the jury did its job, and the integrity of our jury system must be maintained. This jury evaluated the evidence presented, weighed the credibility of the witnesses, and obviously considered all of the potential verdicts available to it before rendering its unanimous decision of guilty as charged. In weighing the sufficiency of the evidence in this case, the trial court repeatedly complained of the lack of direct evidence while simultaneously discounting the abundant circumstantial evidence presented to the jury, which was grossly erroneous. We find the evidence presented to the jury in this case was more than sufficient to support finding Nabors guilty of second degree murder. There was no reasonable basis for the trial court to modify the jury's verdict to a lesser crime, and it clearly erred by doing so.
CONCLUSION
For the foregoing reasons, the trial court's ruling modifying the jury's verdict of second degree murder is reversed, and the five-year sentence imposed by the trial court is vacated. Eric Dominic Nabors' conviction of second degree murder is reinstated, and the matter is remanded for sentencing based on the jury's verdict.
REVERSED, SENTENCE VACATED, VERDICT OF SECOND DEGREE MURDER REINSTATED, REMANDED FOR FURTHER PROCEEDINGS.
*1228 APPLICATION FOR REHEARING
Before Pitman, Garrett, Cox, Stephens, McCallum, JJ.
Rehearing denied.

An amended grand jury indictment was subsequently filed, correcting Jemarion's date of birth to October 27, 2011.

The state subsequently dismissed the charge of possession of marijuana.

The mother has since married and goes by the name Nakiyah Jackson Clark but is referred to as "Jackson" throughout this opinion.

Jemarion's medical records prepared, in part, by Dr. Smith on November 29, 2013, were admitted into evidence.

Photographs of Jemarion taken by Dr. Forsyth and the autopsy and toxicology reports were admitted into evidence.

The release for search and seizure forms signed by Jackson and Nabors were admitted into evidence.

The two advice of rights forms signed by Nabors were admitted into evidence.

The recording of Nabors' police interviews were admitted into evidence.

Photographs taken by Parker at the hospital were admitted into evidence.

Parker's report was admitted into evidence.

Jemarion's medical records from Affinity Health Group and University Health Care, and certified medical records from the night Jemarion died were admitted into evidence.

The Wal-Mart security footage was admitted into evidence, and eight clips were played for the jury.

WMPD advice of rights forms were admitted into evidence. The interview was interrupted several times due to other witnesses arriving at the police station. Following the first interruption, Det. Jones returned to Nabors and asked if he recalled his rights. After the second interruption, Det. Jones re-advised Nabors of his rights.